Thank you, Your Honor. May it please the Court, I am Arden Schenker representing the appellant, Logan, in this proceeding. I should like to begin with a factual pattern. The defendant, in this case, used his position as the plaintiff's financial planner to induce the plaintiff to give the defendant control over the plaintiff's business operations. The defendant took advantage of that position to gain the plaintiff's trust and achieve financial gain without the plaintiff's knowledge. I have disquoted, if the Court please, from the case of U.S. v. Williams. That is the factual pattern in U.S. v. Williams, but it is almost identical with the factual pattern we have here. You have to change the word financial planner to banker. But the facts remain the same, and the significance in U.S. v. Williams, as well, is that that is the case in which this Court adopted the position in U.S. v. Rybicki that the intangible rights fraud theory applies to individuals. That theory, therefore, applies when the victim stands in a fiduciary or trust relationship with the victimizer. What establishes the fiduciary or trust relationship here? I look for it, and I haven't found it yet. The fiduciary trust relationship arises from a number of circumstances in the relationship of the parties. It is sufficient to establish the fiduciary trust relationship if there were, for example, the role of realtor and client. We don't have that here. We do have that here. Mr. Teagues himself said that in 1999, when he was representing the Logan parties in connection with the Avico transaction, he was acting as if he were the Logan realtor. We have a fiduciary trust relationship that automatically arises from a principal and agent relationship. And we have a number of circumstances in which Mr. Teagues operated as the agent for Mr. Logan. But in addition to those specific classic standards for the fiduciary relationship arising, we have the conflated relationship between Mr. Teagues and Mr. Logan. And that, I believe, is sufficient to show that when Teagues the banker made a sale to Mr. Logan as Teagues the producer of potatoes, and when Teagues the producer of potatoes purchased potatoes in turn from one of the Logan companies and purchased them for $68 a ton, and then Teagues the supplier resold the same potatoes from another Teagues company to another Logan operation for $120 a ton, we have that overall relationship between the parties demonstrated by the facts. And they agreed, according to the testimony in this case, which for the purposes of summary judgment must be believed, Mr. Logan and Mr. Teagues did make an arrangement in which Mr. Teagues would control the farming operations, he would provide a continuing line of credit, whether from Western mortgage loans or from the purchase of debts of Logan's various operations, or from providing crop advances, whatever the source of the funds may be, Mr. Teagues would be responsible for those. Mr. Logan's responsibility was to make sure that he ran the farm, that he ran the plant to produce the French fries that provided, in effect, for a conflated relationship, they called it a vertical integration between the two of them. Now, none of this is evidenced in writing, is it? Some of it is in writing, Your Honor. The best of the writings would be the independent diary entries made by Mr. Logan, contemporary with the actual conversations with Mr. Teagues, which we've cited in our briefs. Is there any evidence in the record that indicates that Teagues or his company shared in the profits and losses with regards to Logan's businesses? Absolutely, Your Honor. And what would that be? And the best of that would be from the last of the relationships they had on the Mitsui deal, where a $3 million obligation on the part of Logan would be purchased by Mr. Teagues. This was an agreement between the two of them. And $1 million of the saved $2 million, because a $3 million obligation was purchased for $1 million. And they would split the difference. So Mr. Teagues was receiving a $1 million profit. Mr. Logan was receiving a $1 million profit. And the rest of the agreement was that there would be an amortization of the payout of the additional $1 million so that Mr. Logan was paying off to Mr. Teagues not only his original investment of the $1 million, but the additional $1 million, which was profit to Mr. Teagues, amortized over the reasonable period of time. And there is no controversy in this record that, as a matter of fact, there was a sharing of profits in a deal called the Freets Exchange involving a third party. Mr. Duzeski, they called it the Alexis deal. In that particular transaction, there was a sharing of profits on that three-party transaction as part of the vertical integration of the Teagues and Logan operations. One issue that I have with the approach that is taken in your written argument, in your brief, is that you seem to be arguing it's sort of an all-or-nothing proposition. Either there was a fiduciary relationship that pervaded everything, or there wasn't. But it seems to me that these different transactions can be viewed individually. And some of them, such as the Mitsui deal, perhaps have more indicia in your client's favor than some of the other transactions. Why shouldn't we view your complaint and the evidence on a transaction-by-transaction basis? You can view some of the transactions individually and come to the same conclusion. That there is some, there is any evidence that must be believed that shows that there's jury work here on some of those transactions, whether it's Mitsui or Avico or one of the other transactions. But it follows a fortiori that if there was that overall relationship of the fiduciary nature of the parties coming together, then almost every transaction would be part of that. No, I'm looking, I'm asking really the opposite. If we don't find that there's an overarching fiduciary relationship, do you necessarily lose? Or should we simply look at each piece of this, some of them contractual, some of them other kinds of claims, and look at them individually? And there's very widely different evidence on the different transactions. Yes, indeed, Your Honor. But it is, of course, not the function of the Court to weigh that widely differing evidence. The question is whether there is some evidence on any of those transactions. And the answer to that question is yes. For example, it is undenied, in fact, that Mr. Teague was calling the shots. Dennis Logan's deposition testimony is part of that. There is undenied evidence that Teague's told Mr. Logan to disregard the documents that they were preparing in the Teague's shop. There is no doubt that Mr. Teague's originally solicited the relationship. There is no doubt that the prudential refinancing that was supposed to have occurred in June of 2002, a date to which all of the other transactions was hinged, was one from which Mr. Teague's retreated on the ground that there was something in the prudential documentation that he didn't like. And if you look at the prudential documentation, which is actually Exhibit 144, at the record of 278, you will find that there's nothing offensive in that documentation whatsoever. Indeed, the quality problems with the Teague's products, which is one of the separate kinds of transactions that are involved, particularly on the Teague's counterclaims in this case, is one in which there is no denial of the evidence that Mr. Ware himself reviewed the records and submitted the testimony that was confirmed by the field manager for the Logan operations, Mr. Daniels, that the quality was extraordinarily bad. Moreover, you have secret discounts that were taken by Mr. Teague's, which of course is the consumption of the opportunity, which is for bad when there is a relationship on any of the individual transactions, even if you do not conflate them. But we believe that there was a series of joint ventures here in which Teague's, the banker, would finance Lill, the manufacturing plant of Logan, and provide that vertical integration for the Teague's, that's Oregon Potato Company, Potatoes, so that Teague's, through Pasco and Baker, could take the crops from the Logan operations. And the only obligation that Mr. Logan undertook in these series of joint ventures was to permit the control by Mr. Teague's, which he did, was to pay back the advances with reasonable interest over the reasonably necessary term. We believe, Your Honor, Your Honors, that the evidence is more than ample to be a judgment remedy, unless one weighs the evidence. And even weighing the evidence, we think it's stronger on the Logan side. But it's not our function here, it is not the court's function here, to be weighing that evidence. I would like to discuss the sales pitch to Doosan. In order to, obviously, you've got to have a triable issue about the agency relationship. Yes. It's not something in writing. Why isn't, you know, why isn't this just a situation where, okay, I'll put in a good word for you, I'll see if you can, you know, if I can get you some business? What more, you know, what creates the material issue here? What creates the material issue is Mr. Teague saying, in his deposition, I was acting for Mr. Logan. What creates the material issue is Mr. Teague's assistant, Mr. Audrey, saying in his affidavit that Mr. Teague undertook to act for Mr. Logan. Well, he's a little different in the deposition, though. And he's a little different in his deposition and his affidavit, though, right? Not contradictory, but, yes, there are nuances in the deposition testimony. Well, I was just, with respect to that question from Judge Kelleyan, was there any particular consideration for this agency relationship? Yes, Your Honor. Mr. Teague was still owed monies by Mr. Logan. And Mr. Teague said that he had hoped that he could persuade Mr. Logan, that he, Mr. Logan, would repay more debts to Mr. Teague's as a result of additional profits being obtained by Mr. Logan from the Doosan sales. Which evaporated, in fact, after Mr. Teague returned from Korea and told Mr. Audrey that, in fact, Mr. Teague had told the Doosan representatives not to put the sales through Mr. Logan. Now, counsel, before you proceed, I'd like to go back to Judge Graber's question, because it struck me that when one looks at transaction by transaction, it could very well be that with respect to a given transaction, there might have been this fiduciary relationship or position of trust, whatever. But is it your argument that to find that in one means that one has to find that with respect to all of them? No, that is not our argument. We believe that there is evidence on each of the transactions. Taken separately. Taken separately. We also believe, under the teaching of the Signer case in Oregon, which I think is the lead factual authority in Oregon, you do look at the interrelationships of the parties, not just as banker, which was the defendant's position in the Signer case, but as advisor on the growing of the crops, as one who actually purchased some of the material, as some of the other cases we cited from other jurisdictions quite agree. So I believe that the total interrelationship of the parties is a factor, even if you were to look at them transaction by transaction. In a commentary on the Klinicki case, which is one of the lead authorities which we cited, this one appears in the Yale Law Journal, they describe the opportunity as turning the servile opportunity to gold, which is what we believe Mr. Teague's actually accomplished in this case. And it's certainly below the standard referred to originally by Justice Cardozo in the Menhard case that required a punctilio of honor, even in an individual transaction, because of the requirement of the acceptance of the good faith obligation in each of the contracts. In Oregon, for over 40 years, that has been a part of the contractual relationship between parties, that indeed there must be that good faith relationship that will be honored. That isn't a fiduciary obligation, though. The requirement of good faith is a requirement of how to carry out existing contract terms, and it doesn't alter the contractual relationship, correct? That's absolutely true, Your Honor. I mention it only because of the Court's interest in the transaction by transaction analysis. When one does that type of analysis, I believe it is the case that you will come to the conclusion that there is some evidence, there is any evidence, there is reasonable evidence, transaction by transaction, that does incorporate the good faith obligation. I would like to reserve my remaining time for the Court of Appeals. You may do so, counsel. You certainly may.  We'll hear from opposing counsel. Thank you, ma'am. I'm pleased to court Joe Van Lubben here for the respondent of Teague's parties. Mr. Van Lubben? The Logan Companies were in financial difficulty long before Frank Teague's met Dennis Logan. They emerged from bankruptcy in 1998, and by the time of the initial conversation described in Mr. Logan's affidavit, the companies were already deeply in debt. And you've seen the description. Contractors had filed liens on the French strike plant. There was $8 million owed to the sister company for potatoes that were sold and not paid for. There was debt owed by the farming company to its suppliers for fertilizer and seed. All of those debts were in default, and as a result, the mortgage on the plant, the Bank of America mortgage, was also in default. There was no money to farm. There was no money to buy potatoes. Essentially, the Logan Companies were already in deep trouble, and Frank Teague's didn't cause the situation. Western Mortgage did purchase many of those defaulted debts, and that is Western Mortgage's business. It's in the business of buying distressed debt and collecting that debt and making a profit, and that is exactly what it did or tried to do in this case. It restructured the debt by means of formal contracts, forbearance agreements, promissory notes, mortgages, personal guarantees, those kinds of things. That wouldn't prevent the establishment of either an agency relationship, either on a transaction-by-transaction basis or even a course of dealing where some sort of special relationship under the Oregon law was created, would it? Wouldn't prevent it. I agree with that, but the facts don't support those relationships. Well, that leads to the next question. We're here on summary judgment of almost all of the issues, and wouldn't it be significant if we were to identify certain transactions which do give rise to that inference to establish a genuine issue of material fact with respect to the assertion made by Mr. Schenker in terms of the overall relationship between Mr. Teagues and Mr. Logan? I don't disagree that parties who are not otherwise in fiduciary relationships could enter into a particular transaction that would be a fiduciary transaction agency for one particular purpose. I don't disagree with that premise. I don't think you can bootstrap that into an overarching fiduciary relationship, and I think in that regard, it's important to keep in mind that the transactions that Mr. Schenker has described occurred between six or eight parties over a period of five years, and those transactions did not all occur at the same time, and they did not all occur between the same parties. So I think it's important to keep that in mind in determining whether a transaction, let's say the Abaco transaction, which is in 1999, could create a fiduciary relationship between Western Mortgage, not Frank Teagues, but Western Mortgage, and another Logan company in 2002 or 2003. The Abaco transaction took place over a period of a couple of months. The sale failed, and it was over. So I don't think you can bootstrap an isolated transaction like that into an overarching fiduciary relationship. Well, even though these transactions are separate, there is the common linkage between Mr. Logan and Mr. Teagues going back to the late 1990s. Is that correct? Going back to 1998 was the first potato trade. That's right. But if you look at those transactions, what you see is they are commercial transactions between businesses in which each is operating or hoping to make a profit separately. When the original loans were made, the only loans in this case in late 1998 and early 1999, those were short-term loans. They were supposed to be paid back when the French fry plant sold to the Port of Morrow. There was a pending sale that Mr. Logan was working on. I have some... I'm sorry, go ahead. That didn't happen, and those loans were almost immediately into a default. I have some questions about some of the individual transactions, because this is so... I mean, it's very... Complicated. Yes, it is very complicated. Assuming the existence, just for purposes of a hypothetical, of an agency relationship regarding the Doosan, I don't know if I'm saying that right, Doosan, sales pitch, why does the Audrey affidavit, which survived the motion to strike and indicates Teagues may have disparaged, do you say it Lil or L-I-L or... Lil is the French fry plant. Or Logan, why does that not preclude summary judgment? Well, for a couple of reasons. First of all, if you read Mr. Audrey's deposition, which I obviously had his affidavit and we went into that, he backpedaled pretty strongly on those statements in his affidavit. And in fact, you'll see one, well, secondly, but more importantly, the affidavits of the Doosan people and the Kent people, the agent who was actually the sales agent for Doosan, indicate that the reason that Logan didn't get the sale was because he couldn't meet Doosan's price and they ended up selling to Simplot. But that doesn't answer the question on summary judgment. That's a good jury argument that that isn't really the reason why things fell apart. But I think Judge Callahan's question is, the court below, the district court having refused to strike the Audrey affidavit, and it says, rather than making a sales pitch, they bad-mouthed me. I mean, I guess that's not the phrase he used. Expressed contempt, I think, is the phrase there. Why isn't that enough to survive summary judgment? Well, the question is, I believe, is whether there was a violation in that, of a fiduciary, you know, duty of good faith agent and principal, so that you back up and say was there? Whether it is evidence from which a reasonable finder of fact could so conclude. Correct. And so the question then is, was there a principal agency relationship formed? Is there evidence from which we can infer that? Well, what happened, I think, is what Judge Callahan described, that there's no evidence that Dennis Logan's companies had been selling to Doosan. What was going on there was Oregon Potato Company, the flake plant that was owned by Teagues, was selling to Doosan. Teagues was going over to Korea to work on that relationship. He told Logan, I think in Logan's words, I'll put in a pitch for you. I don't think that that creates an inference that there was an agency relationship there. It's just a favor at best. And so I don't think we get to the point where that creates a fiduciary relationship between those parties such that we can't have a summary judgment on that. Well, are damages, this is, are damages an element of a claim for breach of an agency-based The Logan parties were required to offer some evidence of damages related to the Doosan transaction to survive summary judgment? I think they were, and we made that point in our brief, and in our briefs below. I'm just not sure on that. So, I mean, what is the authority to that? I don't think it's possible to have a claim without damages. I mean, this is not a strict liability, it's a tort. So what you're saying, even if we did say that there was enough for the agency relationship, the fact that there's no evidence of damages would defeat that. Right. But the sale fell through. So the question is, the sale did not occur on behalf of Logan. So you're saying it's only because it was going to fail anyway. But why isn't the same, I agreed to make a pitch, but instead I said you were broke and horrible. Why doesn't that, why couldn't someone reasonable infer that that, in fact, is the reason why the sale fell through, thus supporting damages? There was no sale, I guess, is the easiest way to answer that question. This was, again, not a situation where there was an existing customer relationship, where there were sales. True. But when someone says, I will go forth and try to make sales of french fries, I guess it was, on your behalf, and I go instead and say, take my french fries from those people, they're broke and their products are lousy. And then no french fries are sold. Why couldn't a finder of fact make those things, at least for purposes of summary judgment, to determine that but for the violation of the agreement to make a sales pitch, sales would have occurred? Well, the facts are, setting aside all of the dispute about what was said in Korea, the facts are that Doosan did approach Logan with a proposal to buy french fries, but Logan wouldn't meet their price. So what's the evidence of that recital of facts? That's in the affidavit of Sue Kent and, I believe, Kevin Lee, probably both. Those are the Korean sales agents who met with the Doosan principals. I would like to ask you a question also about the L3 deed and whether it was a mortgage or not. Why isn't there a genuine issue of material fact regarding whether the L3 deed was actually a mortgage based on the factors in Swenson v. Mills? First of all, that claim, if you read the complaint, was stated in such a way that it did not make a claim for an equitable mortgage. What the complaint says is Frank Teagues induced Dennis Logan to give him a deed to L3 for the purpose of securing a debt that was paid. Therefore, they asked for a declaration that Dennis Logan was the owner of the property. Are you talking about the, I can't read Roman numerals, 48? Is that the paragraph number? I don't have it memorized by number, but it's in there, yeah, in the... Sixth claim for relief. Right. So the first and most important legal issue, I believe, there is, was there a debt? And what we have here is a sale transaction documented as such, closed at the title company. A deed is granted and recorded by the title company. In conjunction with that, Dennis Logan is given an option to repurchase and he's given a lease. All of that transaction, that bundled transaction, if you will, none of that contains any kind of a debt. There's no secured obligation, and I think if you look at the cases of all of the factors, you know, the most important factor is the existence of a debt to be secured. In fact, I think if you read Dennis Logan's affidavit, he says that Teagues wouldn't give him a mortgage. He required a deed. Remember, Western Mortgage already had a mortgage on this farm. Well, I have another house of cards question for you in the sense that this is a hypothetical, but if the Court were to reverse summary judgment on the Logan party's claims as to the L3 mortgage deed dispute and the Mitsui discount dispute, must the Court also reverse summary judgment as to WMC's counterclaims? If the first, then is the second necessarily follow? Let's start with the deed. The counterclaim in regard to the deed was to collect rent. That's it. We didn't we added a counterclaim after the motions were filed for foreclosure in case we didn't get summary judgment and the Court somehow deemed it to be a mortgage. But that's not in the case. Really, the counterclaim on which we got judgment was a claim for rent. And that's independent of this issue of whether it's a deed or a mortgage. Regardless, the contract, the transaction required Logan to lease the property back and to pay rent. So that counterclaim wouldn't be impacted one way or another. Judgment on that counterclaim wouldn't be impacted. Counsel, we pretty much have to reverse on Mitsui, don't we, because there's such a distinction between the interpretations on both sides on what that was all about. Number one, who was going to share in the $2 million and how that was going to be allocated. And secondly, the role of the $20,000 payment as opposed to the prior $45,000 a month payment. It just seems to me that there's so many unresolved factual issues there that it that particular issue would not be properly amenable to summary judgment. Let me address that in two respects, because it's the basis of both contract claims and this sort of fiduciary claim that they make. On the contract side, I think the district court was absolutely right. There was no evidence of a particular contract or meeting of the minds between these parties with respect to how that discount would be shared. You know the evidence. Teague says, I agreed to give him a discount if he would pay cash within a reasonable time. Logan says, I never could get him to agree to re-amortize the lease. So Mr. Logan admits that Teagues never agreed to re-amortize the lease. I think what he says, if you read his testimony in his affidavit very carefully, he says he expected it, he assumed it, but Teagues would never agree to it. So that's the contract side of things. I don't think there's a meeting of the minds there. With respect to whether there's a fiduciary duty that somehow arises. What we would have to find there is that this relationship was a joint venture of some kind. The argument that I understand that the Logan side is making there is that there was an agreement to share profits. And I don't think that that's what this relationship is. What you have here, again, is a commercial arm's length agreement in which Western Mortgage buys a debt at a discount and agrees to share that discount. It is getting a benefit because it's going to receive more than it paid. The Logan side is going to get a benefit by receiving a discount and paying less than it was obligated to pay Mitsui. But they're not sharing a joint profit and a joint enterprise. There's no management. There's no sharing of profits. Mutual profits in a business deal doesn't create a partnership. That's, I think, pretty basic in any relationship, presumably between business people. Each side expects to make a profit. That doesn't make them partners. So I think the answer, Your Honor, is that there's evidence that is in conflict about what the deal was. Which, number one, means they didn't have a contract because- But they had a contract for everything except that one term. There was a contract. The question was, what about the $3 million or $2 million? And you're saying your client thought it was an option to buy out the lease for $2 million within 30 days. That's what they thought. And Logan's evidence is that he thought that the terms would be the same, that $3 million would become $2 million. And so most of the contract is agreed upon, and there's one term where each party has a different understanding. Does that mean that the contract claim goes away? Or does that mean there's a jury question about what the meeting of the minds might have been, or what should be done in the absence of a meeting of the minds? I don't think that question can be answered without reference to the particular facts. In other words- Well, I do refer to what I thought the facts were on each side. Each party had some construct in their mind about how that piece of the transaction would play out, and I don't see why that's summary judgment material. Right. My point there is that in that instance, in this instance, the contract term that wasn't agreed to was the fundamental contract term. I mean, the fact that, in other words, if you look at the agreement, the agreement was we will buy this debt at a discount and share the discount. So that part was agreed to. The question is- But the allocation of the share is disputed, is it not? No. I mean, I think that both sides agreed that they would split the discount. So there's a $2 million discount. Fifty-fifty? Fifty-fifty. And that's uncontroverted? Yes. The only question is did they have a meeting of the minds on, again, what the most fundamental point would be, which is from the Teague side, we have a deal to give you a discount for cash. From the Logan side, he doesn't say we had a deal to amortize the lease. What he says is, I expected Mr. Teagues would agree to reamortize the lease. I assumed he would, but he would never agree to do that. Why would Logan make such a deal if he didn't have any cash? Why is it plausible for a fact finder even to find that that was where the minds of the parties met? It's an interesting question in that if you really look at what's going on here, Logan did... Well, what's going on is there are two versions of the facts, I guess, and that's what juries are for. I really just have difficulty seeing why this transaction... Well, what I'm saying is you said, why would he make that deal? All Logan did in this deal was essentially nothing. I mean, Teagues bought the debt at a discount, paid cash money for the debt. Well, Logan paid $20,000, though, right? One payment or $20,000, didn't he? After the lease was purchased, Logan made a payment under a written agreement that said that the lease is in default, this payment doesn't reinstate the lease, et cetera, et cetera. So that he did make a payment. Teagues' evidence there is the reason he was concerned was because it had been so long since any payments had been made on that lease that he was worried about the statute of limitations. Thank you, counsel. Your time has expired. Thank you. Mr. Schenker, you have some reserved time. Thank you, Your Honor. From the first words of opposing counsel's argument that he represents the Teagues parties, I think we have the conflation fact. You cannot look at Mr. Teagues as an individual. You cannot look at him as Western Mortgage Company. You cannot look at him as Pasco. You cannot look at him as Baker. You cannot look at him as Oregon Potato Company, except that he's the one who did make all the deals for each of those companies with Mr. Logan. As a result of which, the Logan parties paid to the Teagues parties $30 million over a period of four and a half years, $12 million of which was profit to Mr. Teagues. Now, that's an uncontested fact. What I think is the key here is the expectations, the reasonable expectations that the party should have had. In the Mitsui deal, it's pretty clear, as Judge Graber's questions indicate, what the reasonable expectation a jury could find Mr. Logan would have had as to what that deal was. And the expectation point is one that is made in Pollack. Pollack is one of the lead cases in Oregon on looking at the good faith obligation in each contract, where the focus is on the party's agreed common purpose and justified expectation. By the way, I apologize to the court that we have cited Pollack, where we should have cited Rybicki on page 32 of the gray brief. I think from the context, one would figure out, but the name Pollack appears at page 32, and it should have been Rybicki. It is not the case that the only loans that were made by Western Mortgage Company were a few equipment loans. It is the case that that was the only set of transactions in which there was a promissory note with security. But Western Mortgage Company was responsible for millions of dollars of credit flowing for the benefit of the Logan parties, some of which came as a direct result of the purchase of debt owing from Logan, and then over a period of time to be repaid to the Teague's parties. I want to ask you the same question that I asked Mr. Van Leeuwen about. If the court were to reverse, hypothetically, the summary judgment on Logan's The Logan party claims as to the L3 mortgage deed dispute and the Mitsui discount dispute, must the court also reverse summary judgment on the WMC's counterclaims? The direct answer is yes. He said no because of the rent, so can you? Yes, the rent was only one piece of the counterclaim on which they prevailed with respect to the L3 property. If, in fact, that was a deed and it was not a mortgage, then they were entitled to assert their counterclaims that included rent, and they did. But if it was a mortgage, then we still have issues that have to be resolved on what the payout should have been and the terms of which that payout should be made by the equitable procedures that are there for the foreclosure of a mortgage. It is our position that we've already paid the underlying debt, and therefore, there would be no rent or any other kind of claim that could be asserted by the defendants in that particular case. The same would be true in Mitsui. That is a $3 million claim that was asserted by Western Mortgage Company, and for which they received their $3 million as part of the counterclaims that were calculated more than once in the three different transactions involving Logan. One was at the time of the point-of-morrow transaction. One was at the point of the stall transaction. And finally, at the Mitsui stage, when the credential matter was brought to a head. I also wanted to comment, Your Honor, on your question with respect to the L3 mortgage and deed, I think it was Judge Graber's question with respect to whether the pleading adequately showed that it was a claim for a mortgage rather than a deed. Judge Brown got that one right, as we point out in our reply brief at page 36. She knew that that was the declaratory judgment that we saw. But before you absolutely run out of time, is there evidence of damages on the Doosan transaction? And if so, what is it? That they did not get the sale. Okay. That is the claim of damages. Okay. We never had to get to the point of how much the sale would have been. Therefore, the quantification of that damage never occurred. Thank you, counsel. Your time has expired. Thank you. The Court would like to express its appreciation of counsel for both sides in a very, very helpful argument in a very complicated case. Thank you very much.
judges: O'scannlain, Graber, Callahan